**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-1907
_____

JAMES FIOCCA and AMY FIOCCA, H/W

v.

TRITON SCHIFFAHRTS GMBH and LOMBOK STRAIT
SCHIFFFAHRTSGESELLSCHAT MBH & CO. KG

James and Amy Fiocca, Appellants
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal No. 1-10-cv-00208)
District Judge: Honorable Joseph H. Rodriguez
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
December 20, 2012

Before:   MCKEE, Chief Judge, SLOVITER, and VANASKIE, Circuit Judges.

(Filed: June 27, 2013)
_____

OPINION
_____

VANASKIE, *Circuit Judge.*

James and Amy Fiocca appeal from the District Court's grant of summary

judgment in favor of Triton Schiffahrts GmbH, and Lombok Strait Schifffahrtsgesellschat

mbH & Co. KG, hereinafter Defendants. The Fioccas argue that genuine issues of

material fact preclude adjudication of their personal injury claims brought under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 905(b). For the reasons that follow, we agree with the Fioccas and will vacate the District Court's entry of summary judgment.

I.

We write primarily for the parties, who are familiar with the facts and procedural history of this case. Accordingly, we set forth only those facts necessary to our analysis.

On June 25, 2007, the M/V Lombok Strait ("LOMBOK"), owned and operated by Defendants, was berthed at the Broadway Del Monte Terminal in Camden, New Jersey, where it arrived on a bi-weekly basis. The LOMBOK is a refrigerated cargo carrier and was loaded with fruit. James Fiocca, an experienced longshoreman, was employed by the Delaware River Stevedores and was discharging cargo from Hold No. 1 of the LOMBOK at the time of the incident.

Hold No. 1 is a raised hold that is accessed on the inshore side of the vessel via ladder and on the offshore side of the vessel by way of a shorter ladder and a set of stairs. Fiocca had boarded the vessel around 3:00 PM via the gangway on the inshore side of the vessel, and walked to Hold No. 1 where he ascended the ten foot ladder. Fiocca was later instructed by his supervisor to go ashore and to leave via the offshore side of the vessel of Hold No. 1 because cargo was hanging over top of the inshore ladder in Hold No. 1, making departure on the inshore side dangerous.

Fiocca walked towards the stairs on the offshore side of Hold No. 1, grabbed the hand railing, and his left foot went out from underneath him. Fiocca fell down the stairs

2

to the bottom of the landing. When he reached the bottom of the stairs, he noticed that the area was wet. The accident was witnessed by Robert Revak, Fiocca's coworker, who confirmed the presence of the water with a sheen of oil at the top of the stairs.

The Fioccas instituted a negligence action against Defendants pursuant to the LHWCA. At deposition, Michael Renzi, the vessel foreman, testified that he observed the greasy water at the 3:00 PM shift change and notified the vessel's crew of the problem. Renzi observed the greasy water again at 4:40 PM, but failed to notify any of the crew members about the continuing problem because no crew members were present. Renzi testified that he was unaware of the root cause of the moisture, but that it was not unusual for there to be water and oil on the deck of the vessel.

The vessel's Chief Officer, Kirill Vereshchak, testified that the water was condensation formed because of the refrigerator compartment below the stairs. (App. 148, 16). The difference in temperature between the refrigerated hold and the deck causes condensate to form once the vessel comes to port.

Captain Ahlstrom, a forensic expert, opined that "James Fiocca was exposed to an unsafe condition while working as a stevedore aboard the M/V Lombok Strait and was caused to fall thereby sustaining injuries." (App. 247). He concluded that "the vessel created this unsafe condition and did not correct the condition after being informed of this condition by Mr. Michael Renzi." (App. 247). "It is clear that this condition should have been corrected in compliance with the company's own Quality Assurance Documents which states these areas should be kept dry during cargo loading and discharging." (App. 247). Captain Ahlstrom finally concluded that "Fiocca was performing his job as

3

longshoremen on the day of the accident in a safe and competent manner and was in no way responsible for his injuries." (App. 247).

Following discovery, Defendants moved for summary judgment on the ground that the Fioccas had failed to adduce any evidence that the vessel owner breached any duty of care owed to the longshoremen working on the LOMBOK. The District Court granted summary judgment in favor of Defendants. The Fioccas filed this timely appeal.

II.

The District Court had jurisdiction under 28 U.S.C. § 1332, and we have appellate jurisdiction under 28 U.S.C. § 1291.

A.

We exercise plenary review over a District Court's grant of summary judgment, *United States v. Allegheny Ludlum Corp.*, 366 F.3d 164, 171 (3d Cir. 2004) (citing *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 224 (3d Cir. 2000)), using the same standard employed by the District Court. *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file… show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is genuine if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. *Id.* The facts will be viewed in the light most favorable to the nonmoving party and all inferences

4

drawn in that party's favor. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000).

B.

A vessel may be liable to a longshore worker under the LHWCA when the vessel, whether acting jointly with a longshoreman or individually, breached a duty owed to the injured worker. *Davis v. Portline Transportes Maritime Internacional*, 16 F.3d 532, 540 (3d Cir. 1994). The Supreme Court has enumerated three general duties that vessel owners owe to longshoremen: (1) the turnover duty, (2) the active operations duty, and (3) the duty to intervene. *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156, 167 (1981). Fiocca alleges that both the active operations duty and the duty to intervene were breached by Defendants.

The active operations duty requires a vessel owner to exercise reasonable care to prevent injuries to longshoremen in the areas of the ship over which the vessel remains in active control after stevedoring operations have begun. *Scindia*, 451 U.S. at 167-68. The active operations duty is triggered where the vessel owner substantially controlled or was in charge of "(i) the area in which the hazard existed, (ii) the instrumentality which caused the injury, or (iii) the specific activities the stevedore undertook." *Davis,* 16 F.3d at 540. The duty to intervene requires the vessel owner to intervene and correct any dangerous conditions that arise during stevedoring operations when it has "actual knowledge both of the hazard and that the stevedore, in the exercise of 'obviously improvident' judgment, means to work on in the face of it and therefore cannot be relied

5

on to remedy it." *Greenwood v. Societe Francaise De,* 111 F.3d 1239, 1245 (5th Cir. 1997) (quoting *Pimental v. LTD Canadian Pacific Bul,* 965 F.2d 13, 15 (5th Cir. 1992)).

1.

In finding insufficient evidence to support a determination that the active operations duty had been breached, the District Court noted that Fiocca's own "gang boss" was in the area of the purported fall for most of the day and was aware of the conditions, but failed to "see a need to cease operations." (App. 10). The District Court concluded that it did "not appear that the vessel's crew was actually exercising control of the area at the time of Plaintiff's fall," making the active operations duty inapplicable. (App. 10). The Fioccas argue that the District Court engaged in improper fact finding when concluding that the location of the accident was not under the active control of the Defendants.

We agree. Fiocca was injured outside of the cargo hold area, in an area used by stevedores to traverse the vessel. The vessel captain testified that the traverse space is not a "working place" for the stevedores:

> A: "Their duty is to be inside the deckhouse, to control the operation of the trolley, of the mechanism itself, to watch for whole cargo operations. In case if there are any other questions from their side, from stevedore side, they always call duty officer. But cleaning or wiping off the condensate, water condensate from deck, that is never done, that has never been done on the fleet. That's normal, just a spot of water. If its outside – actually that's not a working place, working position where the stevedores are going to work."
> Q: Typically, the stevedore is not working there?
> A: "They do not work there."

6

(App. 150, 22-23).  If the traverse space is not considered a working space for stevedores, a jury could reasonably find that the vessel remained in active control of that area at the time of the injury.

The conclusion that a vessel owner may be liable for injuries resulting from oil spills in traverse areas is supported by the legislative history to the 1972 Amendments to the LHWCA.  The legislative history suggests that a ship owner may be liable in the following circumstances:

> [W]here a longshoreman slips on an oil spill on a vessel's deck and is injured, the proposed amendments to Section 5 would still permit an action against the vessel for negligence. To recover he must establish that: 1) the vessel put the foreign substance on the deck, or knew that it was there, and willfully or negligently failed to remove it; or 2) the foreign substance had been on the deck for such a period of time that it should have been discovered and removed by the vessel in the exercise of reasonable care by the vessel under the circumstances.

H.R. Rep. No. 92-1441, at 4704 (1972).

Similar circumstances existed here.  Fiocca's "gang boss" testified that he observed the greasy water at shift change, around 3:00 PM, and informed the vessel crew of the problem.  In accordance with past experience, Renzi testified that after he reported the problem to the mate, he had the expectation that the crew would clean it up.  (App. 162, 10-11).  Renzi's expectation was supported by Captain Ahlstrom, the Fioccas' expert witness, who observed that the vessel's quality assurance documents stated that the vessel would keep the area in question dry during loading and unloading.  Viewing the evidence in the light most favorable to the Fioccas, it is clear that a reasonable jury

7

could have found that the vessel breached its duty of care. Therefore, there exist genuine issues of fact; *i.e.*, who controlled the traverse area at the time of the accident and, if the vessel was in active control of the traverse space, whether the vessel failed to exercise reasonable care to discover any condensate and eliminate any resulting slip hazard. These issues are material to the vessel owner's liability under the active operations theory. Thus, summary judgment was improper.

2.

With regard to the "duty to intervene," the District Court held that the Defendants "should have been able to rely on the stevedore to avoid or eliminate the alleged hazard in this case," because it was not uncommon for condensate to form on the deck above the refrigerated hold. (App. 11). In reaching this conclusion, the District Court referenced an Occupational Safety and Health Administration ("OSHA") longshoring regulation, codified at 29 C.F.R. § 1918.91(b), and our decision in *Kirsch v. Plovidba*, 971 F.2d 1026 (3d Cir. 1992).

The OSHA regulation cited by the District Court provides that a stevedore is only responsible for "eliminat[ing] conditions causing slippery walking and working surfaces in immediate areas used by [the stevedores]." As noted above, there is a genuine dispute of fact as to whether the stairs used by Fiocca to descend from Hold No. 1 remained under the active control of the vessel. There is evidence that the vessel was made aware of the hazardous condition by Fiocca's supervisor a couple of hours before Fiocca's accident. Under these circumstances, a jury could reasonably conclude that the vessel was aware of a hazardous condition and, because egress from Hold No. 1 via ladder on

8

the in-shore side of the vessel was obstructed, a stevedore would encounter the slippery conditions without appreciating the seriousness of the hazard. Accordingly, summary adjudication of the duty to intervene issue was not warranted.

Our decision in *Kirsch* does not compel a contrary result. In *Kirsch*, we addressed only the turnover duty in the context of obvious hazards. 971 F.2d at 1029-30. The turnover duty is not implicated here. Furthermore, whether the wet condition that purportedly caused Fiocca to fall down the stairs was obvious is a disputed question of fact to be resolved by the jury. *See Davis*, 16 F.3d at 540. Even if the hazardous condition was obvious as a matter of law, *Kirsch* did not hold that the vessel is automatically absolved of all responsibility. Instead, *Kirsch* recognized that there are circumstances when "a shipowner cannot reasonably rely on longshore workers to avoid obvious hazards," *id.* at 1030, and that "[i]n many cases, this fact intensive question will be inappropriate to decide on summary judgment…." *Id.* This is such a case.

## III.

For the foregoing reasons, we will vacate the District Court's judgment, and remand for further proceedings.